MITIGATION
WORKS

195 Montague Street, Suite 1244
Brooklyn, NY 11201
Meredith Schriver | 917-473-1891
Thea Krulwich | 347-470-9418
Fax: 646-844-7153

May 24, 2019

Honorable Paul A. Engelmayer
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10013

Re:   United States of America v. Ronald Beasley
      Indictment: 18 CR 390-005 (PAE)

Dear Judge Engelmayer:

This psychosocial report is submitted at the request of defense counsel, Xavier Donaldson, on behalf of his client, Rodney Beasley (known under this indictment as Ronald Beasley), who pled guilty under the above-referenced indictment to Conspiracy to Distribute, Heroin and Fentanyl, (21 USC 846 and 21 USC 841(b)(1)(B)).

## I. INTRODUCTION

The purpose of this letter is to provide the relevant parties in this proceeding with a perspective that may not be reflected in the court papers. Information contained herein is based upon two in-person interviews with our client, Rodney Beasley, and is substantiated in part by interviews with his mother, Phyllis Clemons; his father, Rodney Beasley, Sr.; his sisters, Danielle Clemons and Priscilla Clemons; the mother of his children, Shanova Fuller; and his former partner, Tanisha Grady. We also reviewed the Pre-Sentence Investigation Report prepared by the United States Probation Office, paystubs, certificates Mr. Beasley earned while detained, pertinent legal documents, and consulted with defense counsel.

While we acknowledge the seriousness of the charges against Mr. Beasley, we are asking the Court to consider his extremely unstable childhood—including his parents' drug and alcohol addictions, multiple stints in the shelter system,

diagnoses, and his substance abuse that began at age nine. Mr. Beasley never received adequate treatment related to his traumatic childhood or appropriate services to address his special needs. In the absence of intervention, he self-medicated with marijuana–which provided a temporary sense of relief but also ultimately helped facilitate his criminal justice involvement.

To his credit, Mr. Beasley is willing to participate in community-based services upon his release. He has two children under the age of five and desperately wants to be a loving and supportive fixture in their lives, which he knows he cannot do while incarcerated. Fatherhood has been a positive catalyst for Mr. Beasley; his own father was not present in his childhood and—knowing the pain that caused him—does not want to subject his children to the same life.

Mitigation Works truly believes that Mr. Beasley can—with the appropriate community-based services and support system—turn his life around. He understands that it will not be easy but, for the first time, is willing to accept help. A lengthy sentence will only further distance Mr. Beasley from the treatment and supportive services he needs to live a sober and law-abiding life.

## II. BACKGROUND

Rodney Beasley, Jr. was born ▇▇▇▇▇▇ 1981, at Columbia Presbyterian Hospital to Phyllis Clemons and Rodney Beasley, Sr. He has three younger sisters: Shanequa Beasley, age 36; Priscilla Clemons, age 27; and Danielle Clemons, age 26. At the time of Mr. Beasley's birth, his mother was seventeen years old and his father was sixteen. They were ill-equipped to be parents and had limited resources. Mr. Beasley and his family resided in Section 8 housing in the Harlem neighborhood of Manhattan.

Mr. Beasley's recollection of his early childhood was full of various traumas. His mother excessively drank alcohol and used cocaine. "She used to party," Mr. Beasley said. He was exposed to the drug from a young age and could tell when his mother was under the influence. "Her demeanor changed; she wouldn't want to be bothered and would sleep a lot," he said. Mr. Beasley's father also abused drugs—namely cocaine—and was a sporadic presence in our client's life. "He disappeared a lot," Mr. Beasley said.

The Harlem neighborhood where Mr. Beasley spent the first seven years of his life was a violent and dangerous one, rife with gangs, drugs, and violence. Mr. Beasley was aware of the negativities of his surroundings—both inside and outside his home—and his family's financial struggles. At that time, neither parent worked and instead relied on public assistance to finance daily living necessities. Ms. Clemons admitted, however, that she regularly squandered her welfare check on drugs rather than pay her rent or buy groceries. "We were very poor, and I didn't have myself together back then," she said. Mr. Beasley and Shanequa clung together for support when they went without food, clean clothes, or electricity—all of which were frequent occurrences during their youth.

Despite the chaos around him, Mr. Beasley was enrolled into school in 1987. He started kindergarten at Public School (PS) 180, where he remained through the fifth grade, and reported a difficult transition into his educational career. "I was hyperactive and could not sit still to pay

attention," he said. He was initially written off by teachers as being a problem child and no one attempted to get to the root of his behavioral issues. As a result, Mr. Beasley floundered in his early academic career. He earned poor grades but was nevertheless successively promoted at the end of each year. At that time, his parents were too focused on drugs to realize he was struggling. Mr. Beasley could not rely on his parents or his teachers to help him and he grew increasingly frustrated. "I acted out for attention," he admitted.

In 1988, when Mr. Beasley was seven years old, his parents ended their relationship when his father was incarcerated for a drug-related offense and served approximately five years in prison. Being without his father was difficult, and Mr. Beasley said that he felt a sense of urgency to be the man of the home. At such a young age, however, he did not know how to help his mother, and was left feeling anxious and inadequate. Not long after his father's incarceration, Mr. Beasley and his family entered the shelter system. "I was in and out of shelters for most of my childhood," he said. The shelter was dormitory style; "everyone was together, and beds were stacked in a big room," he explained. As a seven-year-old, Mr. Beasley said that he felt scared and tense in his new environment. Within several weeks, the family moved again, this time to his maternal aunt's—Theresa Clemons—home, who lived across the street from P.S. 180, where Mr. Beasley continued to go to school. While he was relieved to be out of the shelter, he continued to feel displaced.

Mr. Beasley was evaluated by his school in the second grade and diagnosed with a learning disability. "He couldn't read or write," his mother said. He was placed into special education classes, where he remained through the eighth grade. "He was embarrassed but covered it up by being the class clown," Ms. Clemons added. Mr. Beasley received little supportive services at that time; he sporadically saw a school counselor in accordance with his Individual Education Program (IEP) and continued to be unfocused in classes. He bonded with a peer named Tanisha Grady, who was in a similar predicament with her own family. "My mom also used drugs and we lived in shelters," she reported. "He was the only person who understood what I was going through and we always talked about how we wanted to live better lives."

In 1990, at age nine, Mr. Beasley, his mother, and his sister moved back into a shelter in the Bronx, where they remained for approximately two years. Ms. Clemons explained that she was pregnant at that time and wanted to secure her own housing to raise her growing family. Over the next two years, Mr. Beasley's sisters Danielle and Priscilla Clemons were born. Ms. Clemons continued to struggle with addiction after their births; when she was not able to obtain cocaine, she drank in excess. Mr. Beasley reported that he remained enrolled in school at P.S. 180 but missed many days because the Harlem school was located so far from the shelter in the Bronx. He was also embarrassed of being homeless and found it difficult to face his peers; "when people found out they laughed at me," he said. He was also teased for wearing old, dirty clothing. "We did not have a washing machine and we had no money [to go to the laundromat]. A lot of the time we just had to pick out the least smelly clothes we had," Priscilla reported.

Mr. Beasley tried marijuana for the first time when he was nine years old. The substance was readily available in his neighborhood and home, and he said that it gave him a sense of

3

tranquility; when he used the substance, he temporarily forgot about the school, housing, and family problems that plagued him. He quickly started using the substance on a regular basis.

In approximately 1991, the family moved once again, this time to East 128th Street in Harlem. At that time, the neighborhood was still very much in the midst of the crack epidemic, which made it difficult for Mr. Beasley and his sisters to feel safe. There were a lot of abandoned buildings, drug dealers on the street, and drug paraphernalia on the ground. His mother continued to abuse cocaine and alcohol, and his father continued to be absent. "I felt a lot of responsibility for my sisters," Mr. Beasley said. Around that same time, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ following an evaluation at P.S. 180. He and his mother both reported that he was not medicated.

Mr. Beasley was reportedly arrested for the first time in 1994, just before his thirteenth birthday. He spent time at Spofford Juvenile Detention Center before transferring to a facility outside of the city, where he spent approximately nine months. While there, his mother visited "only a few times" because she did not have the funds to travel.

While detained, Mr. Beasley attended school, participated on the basketball team, and graduated from the eighth grade. Although he seemed to thrive academically, Mr. Beasley admitted that he struggled to acclimate to the environment in the facility. "It was really hard; I had to be tough in front of the other kids," he said. He maintained hypervigilance and said that he was afraid of being targeted or seen as weak.

Upon his release from the facility, Mr. Beasley was transferred to Ella McQueen Residential Center, a group home through the New York State Office for Children and Family Services (OCFS), for approximately nine months. There, he attended Erasmus Hall for Humanities in Brooklyn, which he enjoyed "because [he] liked to draw." It was a haven from the group home, where residents were prone to fights and violence. "I saw a lot there," he said. "It was not easy to be around [aggression] all the time."

When he returned to his mother's home in 1996, Mr. Beasley said that, although it was a relief to be back with his family, he struggled to settle back into "regular" life. He was hypervigilant during the first several weeks and experienced intense periods of anxiety. He transferred to Urban Peace Academy, where he started the tenth grade. At that point, Ms. Clemons still used illicit substances and Mr. Beasley felt a tremendous burden to care for his sisters. Priscilla described their mother as "angry all the time and sometimes never came home at night," and added that she and Danielle looked up to their brother. "He became a father to us long before he ever had his own kids," she said. Danielle added that "he is my brother but he's also like my dad." According to Priscilla, not much had changed in the home from when Mr. Beasley was a child; they still went without food at times, wore dirty clothes, and experienced electricity outages. "We were bullied; kids like to pick on you for the things you don't have, and it was really hard on all of us because we had nothing."

Between June 29, 1998 and January 20, 1999, Mr. Beasley was arrested on three drug-related matters. He pled on March 16, 1999, and was sentenced to an incarceratory term of sixteen

4

months to four years to cover all three cases. He was released to parole in February 2000. Mr. Beasley then returned to his mother's home and reunited with his father, who, by that time, was sober. From then on, Mr. Beasley's interaction with the criminal justice system remained regular and largely drug-related. He was incarcerated from May 2001 through May 2004, after which he again returned to his mother's home.

Unable to find work because of his limited education and criminal record, Mr. Beasley resorted to what he knew and was arrested on a minor drug charge in November 2004. He was sentenced to 30 days in jail. His parole was revoked several times through August 2007, until the expiration of his maximum release. Nevertheless, Mr. Beasley continually attempted to find employment. He reportedly worked at the US Open Tennis Tournament in Flushing Meadows, Queens, and then did per diem construction work between 2007 and 2008. He lived with his mother and sisters in the Fordham neighborhood of the Bronx. Priscilla described the neighborhood as very violent. According to a 2015 Community Health Profile conducted by the Department of Mental Health and Hygiene, the neighborhood was the fifth-poorest city in New York, with 42% of its residents living below the Federal Poverty Level. The rate of violence is almost twice the city rate, and the incarceration rate soared at over two times the city rate.[1] "Violence was everywhere," Priscilla said.

In 2008, Mr. Beasley's sister, Shanequa, was a passenger in a city cab that was involved in a horrific accident. She was rushed to the hospital where she waited eight hours for medical care. She was paralyzed from the waist down and has since been unable to live independently. Ms. Clemons—stable and enrolled in college by that time—counted on her other children to help care for Shanequa. It was an extremely difficult time, and his sister's accident took a major toll on Mr. Beasley. Although he was close with all his sisters, he felt a strong connection with Shanequa because they were the closest in age. "He did not take it well," his father reported. Mr. Beasley could not bear to see his sister in such a vulnerable state and isolated himself.

In November 2009, Mr. Beasley was arrested on a federal gun charge in the Southern District of New York and sentenced to a prison term of 120 months. He served his time in West Virginia and said that his family did not have the money or time to visit him. He reportedly took the GED while detained but failed several sections. He began a term of supervised release on June 19, 2012.

Upon his release, Mr. Beasley attempted to separate himself from his prior environments and moved to White Plains for approximately three months before moving back with his mother in the Bronx. By that time, Ms. Clemons was employed with the Human Resource Administration (HRA), where she continues to work. Mr. Beasley reportedly completed a six-month outpatient substance abuse treatment program through Samaritan Village. He also quickly started a relationship with Shanova Fuller and became a father-figure to her two children, who were thirteen and eight years old at that time. "He treated them like his own and always got along with them," Ms. Fuller reported. By 2013, they moved into a shelter in the Bronx together and Mr. Beasley obtained employment as a porter at a local deli, Blake and Todd.

---

[1] https://www1.nyc.gov/assets/doh/downloads/pdf/data/2015chp-bx5.pdf

Mr. Beasley and Ms. Fuller expanded their family with the birth of ███████ 2014. "He was so good with the baby," Ms. Fuller said, adding that Mr. Beasley wanted to be present for every moment of fatherhood. Mr. Beasley said that he was ecstatic to be father and that his view of the world changed. "It was all about ███ from then on." Those closest to Mr. Beasley noted a transformation within him. Everyone we interviewed talked about how he reveled in fatherhood and desperately wanted his son to live a better life than he had. "He was happy," his mother added.

Mr. Beasley and Ms. Fuller both reported that ███████████████████████████ at a young age. "[Mr. Beasley] went to every doctor appointment," Ms. Fuller said. Perhaps as a response to his son's illness and rising medical bills, Mr. Beasley returned to the street to supplement his income. He was arrested on a drug sale charge on June 12, 2015, and sentenced to an incarceratory term of two years. His family visited him regularly and brought his son so that they maintained a relationship. It was the first time he felt supported while serving his time.

Mr. Beasley was released in February 2017 and lived in Ms. Fuller's home in Brooklyn. He reconnected with Ms. Grady, who said that he was an extremely loving father to ███. By October 2017, Mr. Beasley had obtained seasonal work at UPS as a stockperson and delivery driver. (*See attached paystubs.*) The following month, his second child, ███████ was born. Like ███████████████████████████████████████ regimen. Mr. Beasley was attentive to both of his children's needs and, according to Ms. Fuller, attended every one of ███ school functions and parent-teacher conferences.

Mr. Beasley's position at UPS expired at the end of January 2018 and he was unable to find employment. By March, he admitted that he was back on the streets to provide for his family.

Since his arrest for the instant matter on June 5, 2018, Mr. Beasley has been detained at Metropolitan Detention Center (MDC) in Brooklyn where he works as a unit orderly. His duties include taking out the trash, cleaning bathrooms and offices, and "whatever else [he is] asked to do." He also participates in programs offered and has earned certificates in "Structured Activity" and "Alternative to Drug Dealing Workshop." (*See attached certificates dated 6/20/2018 and 9/26/2018.*)

In February 2019, MDC made national news when electricity was lost for days during a polar vortex. Mr. Beasley was among the individuals without lights, heat, hot food, or legal visits. "It was traumatizing," he said. "We were freezing; vents were blowing cold air into the [already freezing] cells and we ripped socks to make sleeves." Mr. Beasley added that he was in a cell with an individual who did not receive necessary psychiatric medication during that time. "I couldn't sleep; I was scared he might try to hurt me. I did not know what he would do." As the days went on, Mr. Beasley said that he "never experienced anything like [that]. It's still hard to sleep because of it."

### III. EVALUATION

6

In interviews, Rodney Beasley presented as a thoughtful, motivated, and courteous individual who was embarrassed of his criminal justice involvement and determined to change the trajectory of his life. He was cooperative and answered questions, we believe, to the best of his ability. Mr. Beasley grew up in an unstable and chaotic home where his parents did little to protect him or encourage positive growth and advancement. During his childhood—crucial years of development—both his parents were active drug abusers and alcoholics who failed to adequately support Mr. Beasley's immediate needs. Money was scarce and, many times, Mr. Beasley did not have food, proper clothing, or even a roof over his head. Being in the shelter system on multiple occasions as a child was difficult for him in a myriad of ways; he did not have a stable place to call home, he was often scared of his surroundings in the shelter, and he was bullied and taunted by his peers for being poor. His father's regular absence due to incarceration only added another layer of trauma. Such parental neglect and untreated childhood trauma set a precarious stage for Mr. Beasley as he grew up. He grappled with his own inadequacies and familial shortcomings, and searched for someone or something that would make him feel whole. Unfortunately, without parental supervision, Mr. Beasley filled the voids he felt with drugs and the unsavory influences of his neighborhood. He first used marijuana at nine years old and quickly followed the lead of individuals who groomed him into street life. For the first time, he felt accepted and seen—feelings he craved from his parents.

While the fast money he earned on the street was alluring to Mr. Beasley as a child, it also provided him with a sense of stability. For the first time in his life, he wore clean clothes and was able to buy himself and his sisters food when Ms. Clemons could not. The money became a safety net and something the Mr. Beasley thought could lift his family out of poverty and onto solid ground. Still very much a child, Mr. Beasley's interaction with drugs—both using and selling them—was normalized. Drugs surrounded him at home and in his community—and had for his entire life. "Every neighborhood I ever lived in was full of [drugs]," he said. "After a while you don't think twice about them."

Mr. Beasley's early interaction with drugs, unsurprisingly, led him off course. After his first arrest at twelve years old, he quickly fell into a revolving door relationship with the criminal justice system; he cycled between detainment and the community with very little intervention; in fact, it seems that he did not participate in treatment until he was in his thirties—approximately twenty years after his first arrest. With no community-based services or support, a limited education, and few employment prospects due to his criminal record, Mr. Beasley continually returned to what he knew—selling drugs. Periods of incarceration have not adequately addressed his addiction or past traumas; rather they have served to systematically distance him from community-based resources that could have helped him. Mitigation Works truly believes that if Mr. Beasley had received an intervention as a child and felt nurtured and supported, his life trajectory could have been much different.

[redacted] related to his extremely unstable childhood. A report by the National Child Traumatic Stress Network (NCTSN) showed that a traumatic event "leaves little emotional energy for adjusting to change, and compromises the child's ability to function in school or with friends." Similarly, the Centers for Disease Control and Prevention (CDC) has reported that children who

7

experience adverse childhood experiences are more at risk that those who do not for an array of health and social issues, including illicit drug use, risky behaviors, and low life potential (i.e.: no diploma, limited employment, and poor academic achievement)–all of which with Mr. Beasley struggles. Following an adverse childhood experience, a child may be more likely to experience social, emotional and cognitive impairment. While it was reported that Mr. Beasley sporadically attended counseling in school, those sessions did not begin to address his trauma, his low self-esteem, and perceived inadequacies. This, compounded with genetic disposition to substance abuse, seemed to have put Mr. Beasley on a downward trajectory as he struggled to grasp a sense of normalcy and stability in his life.

Furthermore, regarding the violence and associated hypervigilance Mr. Beasley experienced beginning from a very young age, a 2017 study published in the Journal of Health Care for the Poor and Underserved reported that there are

> "significant associations between children's exposure to violence in urban communities, posttraumatic stress, and maladaptive behavior. Exposure to community violence and unaddressed trauma have been shown to be significant risk factors for future perpetration of crime and violence. Youth exposed to violence are at greater risk of aggression, substance abuse, adult criminality, depression, anxiety, and other mental health problems."

These findings are significant because they help us understand the effect that one's environment has on individuals like Mr. Beasley. His underdeveloped support system in adolescence led him to maladaptive ways of coping with lingering feelings of low self-worth and fear. At only nine years old, he began using marijuana. Drug use in adolescent years is particularly risky because the brain is still very much developing; the use of illicit substances during that time is linked to increased short- and long-term cognitive impairment, greater impulsivity, and mental health diagnoses. [redacted] instead, he was left to his own devices and continued to self-medicate.

Mr. Beasley's criminal justice involvement seems to be inextricably related to his unstable and troubling upbringing. Mitigation Works believes that once his trauma is properly dealt with, he can go on to lead a productive life within his community. The road of transformation is a difficult one and often filled with many hurdles, and Mr. Beasley has admittedly struggled in the past and chosen the option with instant gratification. He is finally in a place where he is ready to leave it in the past once and for all. He desperately wants to be a present and supportive father to his children—something he did not have—and knowing his children are struggling with his absence is devastating to him. He benefits from support and encouragement from his family, all of whom have opened their homes to him up his release and will work with him to secure gainful employment.

Mr. Beasley is so much more than a statistic. His life story is valuable and offers critical context to his criminal justice involvement. We respectfully ask that the information in this report be considered that that Mr. Beasley be sentenced with a degree of compassion. He has the capability and motivation to live within the confines of the law and is willing to accept help. A lengthy sentence will only further distance Mr. Beasley from his children as well as the treatment and supportive services he needs to live a sober and law-abiding life.

We thank you for your time and consideration.

            Respectfully submitted,

            *M. Sch—*

            Meredith Schriver, MA
            Senior Mitigation Specialist

9

| EMPLOYEE NAME | | | | WORK LOCATION | | | CHECK NO. |
|---|---|---|---|---|---|---|---|
| Y BEASLEY | | | | 0720 NYMNS PKG 1003 | | | 0720075239 |
| MPLOYEE I.D. | TAX I.D. | | FEDERAL STATUS | STATE WORK | STATE RES STATUS | | CHECK DATE |
| | | | S 00 | S 00 | | | 11/30/2017 |
| PERIOD BEGIN | PERIOD END | | TOTAL EARNINGS | TOTAL TAXES | TOTAL DEDUCTIONS | | NET AMOUNT |
| 11/19/2017 | 11/29/2017 | | 269.50 | 54.60 | 0.00 | | 214.90 |

| EARNINGS | | | | | TAXES - DEDUCTIONS - MISC | | |
|---|---|---|---|---|---|---|---|
| ION - RATE - MILES - HOURS - GROSS PAY | | | | | DESCRIPTION | CURRENT | YEAR-TO-DATE |

```
CURRENT PAY RATE   11.00
AR    11.000                                         TAXES
HOURS WORKED    24.50    269.50         FICA              16.71     68.07
NT TOTALS       24.50                   FICA MEDICARE      3.91     15.92
TOTALS                   269.50         FEDERAL TAX       24.82     91.73
                99.81  1,097.91         ST TAX- NY         5.09     17.35
                                        NYC RES            4.07     14.75
                                        TOTALS            54.60
```

| EMPLOYEE NAME | | | | | | |
|---|---|---|---|---|---|---|
| ASLEY | | | | | | |
| EE ID. | | | | | | |
| | TAX I.D. | | FEDERAL STATUS | WORK LOCATION | | |
| PERIOD BEGIN | PERIOD END | TOTAL | S 00 | 0720 NYMNS PKG 1003 | | CHECK NO. |
| /24/2017 | 12/30/2017 | EARNINGS | STATE WORK | STATE RES STATUS | | 0720127923 |
| RATE | MILES · HOURS · GROSS PAY | 199.54 | S 00 | TOTAL DEDUCTIONS | | CHECK DATE |
| PAY RATE | 11.00 | | TOTAL TAXES 35.41 | | | 01/04/2018 |
| ED | 18.14 | | DESCRIPTION | DEDUCTIONS 0.00 | | NET AMOUNT |
| | 18.14 | 199.54 | TAXES | CURRENT · MISC | | 164.13 |
| | 18.14 | 199.54 199.54 | | TAXES | | YEAR-TO-DATE |
| | | | FICA | 12.37 | 12.37 | |
| | | | FICA MEDICARE | 2.89 | 2.89 | |
| | | | FEDERAL TAX | 15.53 | 15.53 | |
| | | | ST TAX- NY | 2.29 | 2.29 | |
| | | | NYC RES | 2.33 | 2.33 | |
| | | | TOTALS | 35.41 | | |

| UPS | EMPLOYEE NAME | | | WORK LOCATION 0720 NYMNS FYR 1 101 | | CHECK NO. 0720134871 |
|---|---|---|---|---|---|---|
| | EMPLOYEE ID | TAX I.D. | FEDERAL STATUS S 01 | STATE WORK S 00 | TATE RES STATUS | CHECK DATE 01/11/2018 |
| EARNINGS STATEMENT | PERIOD BEGIN | PERIOD END 01 06/2018 | TOTAL EARNINGS 290.55 | TOTAL TAXES 60.95 | TOTAL DEDUCTIONS 0.00 | NET AMOUNT 229.60 |
| DESCRIPTION | EARNINGS RATE - MILES - HOURS - GROSS PAY | | | TAXES DESCRIPTION | DEDUCTIONS CURRENT | MISC YEAR-TO-DATE |

```
            CURRENT PAY RATE    13.00
REGULAR                 18.00    234.00
OVERTIME    19.500       2.90     56.55
TOTAL HOURS WORKED      20.90
CURRENT TOTALS                   290.55
Y T D TOTALS            39.04    490.09
```

```
                    TAXES
FICA                 3.02      29.33
FICA MEDICARE        1.22       7.11
FEDERAL TAX         17.18      43.51
ST TAX- NY           5.43       8.22
NYC RES              4.00       7.13
    TOTALS          30.95
```



U.S. Department of Justice
Federal Bureau of Prisons
MDC Brooklyn Education Department

Presents this Certificate to

*Rodney Beasley*

In recognition of *participation* in

**Alternative to Drug Dealing Workshop**

MDC Brooklyn

June 20, 2018

R. Persaud – Education



# MDC Brooklyn
## Recreation Department

This is to Certify that

**BEASLEY, RODNEY**

Has Successfully Completed:

*Structured Activity (Running/Walking)*

At MDC Brooklyn

This certificate is hereby issued this 26th day of SEPTEMBER 2018

*e. white*
Recreation Specialist